The **HANOVER FIRE INSURANCE COMPANY**, Appellant,

v.

**BOCK JEWELRY CO., Inc., et al.,**
Appellees.

No. 17123.

Court of Civil Appeals of Texas.

Dallas.

Dec. 6, 1968.

Rehearing Denied Jan. 3, 1969.

Robert Lee Guthrie, Johnson, Guthrie, White & Stanfield, Dallas, for appellant.

Harold B. Berman, of Berman & Fichtner, Jerry P. Jones and John W. Copeland, of Thompson, Knight, Simmons & Bullion, Dallas, for appellees.

DIXON, Chief Justice.

Hanover Fire Insurance Company, hereinafter called Hanover, has appealed from two adverse summary judgments. One was a money judgment in the amount of $4,-934.89 in favor of Bock Jewelry Co., Inc. (owned entirely by Harry Bock) and Harry Bock, doing business as Harry Bock Co., hereinafter jointly referred to as Bock. The other was a judgment that Hanover take nothing against Sam Bitkower, a third party defendant, brought into the case by Hanover under a subrogation claim. Hanover had also filed a motion for summary judgment which was overruled.

The suit was brought by Bock to recover under a jeweler's block insurance policy for loss occasioned by a theft of diamonds while in the possession of Bitkower.

## EVIDENCE

Most of the evidence is undisputed. Bock, a resident of Dallas, Texas, is a wholesale jewelry dealer. Bitkower is a traveling salesman who is authorized to sell Bock's diamonds anywhere except in Texas. In actual practice he has limited his sales activities to Kansas, Iowa and Nebraska. He represents two other companies besides Bock. He travels when and where he pleases. He calls on customers of his own choosing. He does not draw a salary. Bock does not control the hours Bitkower works, or carry workmen's compensation insurance for him, or make social security payments in his behalf.

Under the terms of their agreement, which is partly oral, Bitkower carries with him a supply of Bock's diamonds for display and sale at minimum prices set by Bock. He is paid a commission of 5 per cent and sometimes 10 per cent. If he is able to sell at a price above that fixed by Bock he is permitted to keep the excess in addition to his commission. If he sells on credit the sale must be approved by Bock. On cash sales if he is able to fill an order from the supply of diamonds in his possession, he makes delivery at once, collects the purchase price and remits the money to Bock after deducting the amount of his commission. If he is not able to fill an order from the diamonds in his possession he sends an order to Bock and the diamonds are shipped to the customer.

When a supply of diamonds is turned over to Bitkower in Dallas he signs a memorandum filled in on a printed form, listing and describing the stones he takes. If he is on the road and needs to replenish his supply of diamonds, they are shipped to him accompanied by a memorandum which he is not required to sign.

Both Bock and Bitkower say that these memorandums, standard printed forms in the jewelry business, are for bookkeeping and inventory purposes only and that they do not state and were not intended to state the terms of the contract between them. However Hanover attaches contractual significance to them because of these recitations in each form:

"Memorandum From

BOCK JEWELRY COMPANY, INC.
Manufacturing Jewelers and Diamond
  Importers"

\*    \*    \*    \*    \*    \*

"The goods described and valued above are delivered to you for EXAMINATION AND INSPECTION ONLY and are the property of BOCK JEWELRY COMPANY, INC., and subject to their order and shall be returned to them on demand. Such merchandise, until returned to them and actually received, are at your risk from all hazards."

Alfred L. Cozzo is a general insurance agent who represents a number of companies, including Hanover. For about ten years Bock has obtained theft as well as other types of insurance coverage through Cozzo. For twenty years Cozzo has been in the business of representing companies which issue jeweler's block policies. He

has represented Hanover since November 3, 1961.

A short time prior to the issuance of this policy Bock contacted Cozzo in order to secure theft insurance on diamonds while in the possession of various persons including Bitkower. In order to obtain a jeweler's block policy of insurance the person seeking such coverage must first execute an application known as a proposal. The procedures culminating in the issuance of this policy are shown by the testimony of Cozzo, Hanover's agent. Cozzo testified in a deposition as follows:

"Q What is the procedure to get this application completed? What do you do and what is done?

A Well, my normal procedure is to take an application and go to the company requesting coverage, completing the application and getting some one of the owners of the business, whether it is a corporation or a partnership or individual, to sign that contract or the application for the coverage. The completed application is sent to the particular company that you are trying to place the coverage with, who, in turn, sends the proposal or the application to the Inland Marine Rating Bureau, who in turn, rate the policy, send back to the company the rates that have been promulgated. The company, in turn, issues the contract for insurance, mails it to me and I, in turn, get it to the insured."

\* \* \* \* \* \*

"Q Was that done with the policy in your hand there?

A Yes sir, I did.

Q This application is also known as a proposal, is it not?

A Yes, it is called a proposal for insurance."

\* \* \* \* \* \*

"Q Now, looking at Exhibit No. 1, which you have identified to be exactly the same as the proposal attached to the

policy, who filled that out, Mr. Cozzo? \* \* \*

A My office did, or I did it myself personally."

\* \* \* \* \* \*

"Q Typed under your direction at your office?

A Yes.

Q \* \* \* How did you get your information for the purposes of typing it?

A I would take an application and fill it in by hand and then type the handwritten onto another proposal.

Q So you would take a blank proposal blank and go to Bock Jewelry Company and Harry Bock Company and then fill it in in pencil and then go back and type it; is that correct?

A Yes.

Q Who gave you the information for purposes of that proposal?

A Harry Bock."

\* \* \* \* \* \*

"Q Well, you asked him questions, did you not, Mr. Cozzo?

A Oh, yes.

Q As you went through there, I assume you asked him the questions that appeared on the application or proposal?

A Yes.

Q And he answered them?

A Yes.

Q Now, if you will turn your attention to the portion of the proposal in which Mr. Bitkower's name appears—I think that is 12(b), is it not?

A Yes, it is.

Q Do you recall what was told you in regard to the information that you required for this application?"

\* \* \* \* \* \*

"THE WITNESS: Well, I was told that Mr. Bitkower was a salesman for Bock Jewelry Company.

Q (By Mr. Berman) Were there any other conversations between you and Mr. Bock concerning Mr. Bitkower?

A No, except I had to know the number of days that he would be out with merchandise and the average amount and the maximum amount of coverage that would be provided, which would make the rating possible for the jeweler's block policy."

\* \* \* \* \* \*

"Q So you also were told he would be carrying Bock's merchandise, were you not?

A Yes. That is the reason for his asking for coverage."

\* \* \* \* \* \*

"A Down through the years of dealing with the Bock Jewelry Company, I have taken Mr. Bitkower off of the Bock Jewelry Company and then have added him back on during the course of the years, because he would not have merchandise or diamonds, and I think at one time, the relationship between Mr. Bitkower and Bock Jewelry Company must have ended because Bock Jewelry Company asked me to take Mr. Bitkower off the policy. Now, it was not this particular policy that you have there, but down through the years, this has happened.

Q But on this particular policy, you apparently were asked to put him on?

A Yes, I was asked specifically to put him on.

Q Weren't you also told that Mr. Bitkower would have merchandise belonging to the insured in this policy and they wanted to be covered?

A I was asked to provide certain coverage for Mr. Bitkower who would act as a salesman for Bock Jewelry Company.

Q What certain coverage were you asked to have for Mr. Bitkower?

A The usual outside exposure of an outside salesman.

Q What is the usual outside exposure?

A Theft, burglary, fire; primarily, theft and burglary.

Q *And in your experience, in your 20 years' experience of writing this type of proposals, is this where you usually fill in that information when you are trying to get that type of coverage?*

A *That is the same place I have always put their names."* (Emphasis ours.)

\* \* \* \* \* \*

"Q If you were writing the coverage today, how would you have changed the proposal furnished to you by The Hanover Fire Insurance Company to complete to reflect the coverage on a man like Mr. Bitkower for Bock Jewelry Company or Harry Bock Company?"

\* \* \* \* \* \*

"A I would have to put them, unless they were an employee, I would have to put them under Question 22 of the proposal, or I have been instructed.

Q *That was instructions you received after this matter had come up?*

A. *Yes, after the loss occurred.* \* \* \*" (Emphasis ours.)

\* \* \* \* \* \*

"Q *Had you ever had any instructions like that before that time?*

A *No."* (Emphasis ours.)

\* \* \* \* \* \*

"Q Is it your practice to fill in as much of the information as you can before you go to the policyholder's place of business, or wherever you might meet with him to get his signature on the document, and obtain the rest of the information which you do not have?

A It is."

\* \* \* \* \* \*

"A Well, one question I will have to always ask is whether he has any salesman, and this is one thing that my office would not provide the answers for.

Q Had you ever been told by any representative of The Hanover Fire Insurance Company or Jones & Whitlock that this had to be a salaried employee?

A No.

Q And you made then no inquiry at all as to whether or not this was an independent salesman or whether this was a salaried employee of Bock Jewelry Company?

A No."

\* \* \* \* \* \*

"Q At first, were you told to provide coverage for Mr. Bitkower?

A I would have had to have been.

Q *And you selected the manner in which this was to be accomplished?*

A *Yes.*

Q *In conformity to what you felt were the instructions you had received from the companies?*

A *Yes."* (Emphasis ours.)

The written proposal in this case is made out on a printed form furnished by Hanover. Since our decision must turn on the significance of the information furnished as shown in the proposal as well as the manner in which it was obtained we copy excerpts from the instrument:

"3. EMPLOYEES: a. How many employees have you? None "
     .....

\* \* \* \* \* \*

"12. PROPOSER, EMPLOYEES, MEMBERS OF THE FIRM OR OFFICERS OF THE CORPORATION HAVING PROPERTY IN THEIR CUSTODY OR CONTROL OUTSIDE OF OUR PREMISES AS SET FORTH IN QUESTION 1c. DURING THE LAST 12 MONTHS:

Note: *All carrying of goods outside of the Proposer's premises must be reported in this section.*

a. In cities or towns in which the Proposer's premises are situated.

| NAME | Number of Days | Average Amount | Maximum Amount |
|---|---|---|---|
| Post Office Delivery | | 500. | $20,000. |
| Harry Bock | 20 | $10,000. | 20,000. |
| Abram Bock | 1 | 100. | 5,000. |
| Elaine Bock | 20 | 1,000. | 5,000. |

b. Elsewhere in the states of United States, the District of Columbia, Canada and Puerto Rico.

| Harry Bock | 5 | $10,000. | $20,000. |
|---|---|---|---|
| Sam Bitkower | 200 | 2,500. | 10,000. |

\* \* \* \* \* \*

22. The estimated average daily amount of property in the custody or control of others, except as provided in answer to Questions 12, 18b and 21 during the last 12 months was $50.

\* \* \* \* \* \*

Signing this form does not bind the Proposer to complete the insurance, but this Proposal shall constitute a warranty should a policy be issued."

Bock in a deposition testified that he read the proposal before he signed it, and that the proposal and policy were in accordance with the agreement between him and Cozzo.

The policy itself contains these provisions:

"1. IN CONSIDERATION OF the premium above specified, and of the Proposal and Declaration dated the 3rd day of January, 1966, attached hereto and made a part hereof and which is hereby agreed to be the basis of this policy, and which the Assured hereby warrants to be true as to each and every statement and particular contained therein,

THIS COMPANY DOES INSURE:",
etc.

\* \* \* \* \* \*

"7. \* \* \* No agreement, condition, or declaration of this policy shall be waived or changed, nor shall notice to, or knowledge possessed by any agent or any other person be held to effect a waiver or change in any part of this policy unless endorsed hereon." (Amendatory Endorsement of February 9, 1966.)

\* \* \* \* \* \*

"12. This Insurance shall in nowise inure directly or indirectly to the benefit of any carrier or other bailee." (Amendatory Endorsement of February 9, 1966.)

OPINION

The substance of appellant Hanover's first point of error is that the assureds cannot recover on this jeweler's block policy for loss of the diamonds by theft because the assureds warranted that Bitkower, who had possession of the diamonds at the time, was a member of the assured's firm or an officer of the assured corporation at the time of the theft, whereas in truth and in fact Bitkower was an independent jewelry dealer.

■ We do not agree with appellant. Bitkower was not an independent dealer. He was not selling his own diamonds at prices set by himself. He was a semi-independent sales agent employed by Bock to sell Bock's diamonds on a commission basis at a minimum price set by Bock.

Certainly Bitkower was not an employee who worked full time for Bock at a fixed salary or wage and who was subject during his hours of work to the control and direction of his employer in regard to the manner and time of performing the duties of his employment. In the proposal Bock stated that he had no employees.

Appellant's complaint is that Bitkower was named under paragraph 12b. whereas he should have been named under paragraph 22. This alleged mistake according to appellant constituted a breach of warranty which voided the policy.

It is true that paragraph or section 12 of the proposal begins by referring to "Proposer, employees, members of the firm or officers of the corporation having property in their custody or control outside of our premises as set forth in Question 1c. during the last 12 months." But paragraph 12 also contains this recitation which is printed on the form in italics for emphasis: *"All carrying of goods outside of the Proposer's premises must be reported in this section."* It is under the heading "b." of paragraph or section 12 that Bitkower is named. He is shown as a person carrying goods "Elsewhere in the states of United States" for an average of 200 days during the last 12 months—goods of an average value of $2,500. The maximum amount of insurance requested on goods in Bitkower's possession was $10,000.

■ Hanover argues that the recitation printed in italics and quoted above necessarily referred only to proposer, employees, members of the firm, or officers of the corporation and that Bitkower does not come within any of said categories. But the recitation is certainly not by its own

terms so limited. It says *"All* carrying of goods outside the premises * * *." (Emphasis ours.) The provision is confusing to say the least. And any doubt must be resolved against Hanover. Lane v. Travelers Indemnity Co., 391 S.W.2d 399, 402 (Tex.Sup.1965); Southern Surety Co. v. Butler, 247 S.W. 611 (Tex.Civ.App., San Antonio 1922, no writ); Wright v. Fraternities Health & Accident Ass'n, 107 Me. 418, 78 A. 475 (1910).

At the time of the theft Bitkower was carrying goods belonging to Bock "elsewhere in the states of United States" of a value in excess of $2,500.

Bitkower was not named in paragraph 22 where it was stated that the "average daily amount of property in the custody or control of others, *except as provided in answer to Questions 12 * * ** during the last 12 months was $50." (Emphasis ours.) Having been named in paragraph 12 by Hanover's agent it is easily understood why Bitkower was not named in paragraph 22 in view of the above exception.

We cannot overlook the fact that the preparation of the proposal signed by Bock was accomplished under the supervision of Cozzo, Hanover's agent, on a printed form furnished by Hanover. It is for that reason that earlier in this opinion we quoted at length from Cozzo's testimony. It is undisputed that Bock requested coverage that would include diamonds while in the possession of his sales agent, Bitkower, away from Bock's premises. In other years Bock had requested such coverage and so far as he and Cozzo knew and intended he had obtained and paid for such coverage. Cozzo made out the proposal in the same manner that he had been preparing proposals on the same printed form over a period of years. There had never before been any complaint about the proposals as made out by Cozzo. If it was a mistake to name Bitkower in paragraph 12 instead of paragraph 22 Cozzo did not know of it until after the theft in this case, when Hanover so informed Cozzo and gave him specific instructions in regard to preparing proposals in the future.

■ The mistake, if it was a mistake, of naming Bitkower under paragraph 12 of the proposal instead of under paragraph 22 was primarily the mistake of Cozzo, Hanover's agent. There is no charge of fraud in this case. There is no question of Bock's intention and request to secure coverage of diamonds in Bitkower's possession and his belief in and reliance on Cozzo's assurances that he had obtained such coverage. Under the circumstances we do not believe that the policy should be voided because of the mistake, technical in nature, if it was a mistake, of naming Bitkower under paragraph 12 instead of paragraph 22.

Appellant cites the case of Great American Ins. Co. v. Lang, 416 S.W.2d 541 (Tex. Civ.App., Austin 1967, writ ref'd n. r. e.), in which a jeweler's block policy was voided because of a breach of warranty. But the Lang case is easily distinguishable from this case. In *Lang* the assureds warranted that they would have sixty-five per cent of the insured property inside the store safe after the store was closed. This they failed to do. The burglars did not open the safe. The warranty in question was a *promissory* warranty held to a material provision of the proposal. 32 Tex.Jur. 2d 404.

The warranty involved in the case now before us was not a promissory warranty. Both paragraph 12 and paragraph 22 were concerned with past existing facts—that is the average number of days and the average value of diamonds carried elsewhere than on the premises during "the last 12 months."

Moreover, in the Lang case there is no showing as there is in this case, of any technical mistake made primarily, though innocently, by the insurance company's own agent.

Appellant's first point is overruled.

In its second point Hanover contends that there was no liability under the policy because title to the diamonds had passed to Bitkower prior to the theft. We see no merit in this point. The memorandums which Hanover regards as contractual in nature expressly stated that title remained in Bock. But we think the undisputed evidence, in addition to the memorandums, clearly shows that title to the diamonds remained in Bock. We are convinced and we hold that the record establishes liability of Hanover to Bock on the policy. Appellant's second point is overruled.

In its points three to seven, each pleaded in the alternative, Hanover contends that (3) if title to the diamonds had not passed to Bitkower prior to the theft, then the diamonds were in Bitkower's possession as bailee at his risk and Hanover was entitled under subrogation to judgment over against Bitkower for the amount of the judgment rendered in favor of Bock; (4) if the right of Hanover to recover against the bailee, Bitkower, is defeated by any agreement between the assureds and the bailee, then the assureds have breached the condition of the policy providing that it will not inure to the benefit of any bailee and the assureds have invalidated the policy; (5) if Hanover's right of recovery against the bailee, Bitkower, is not defeated by any agreement between the assureds and the bailee, then the insurer's rights of subrogation against Bitkower have been destroyed by such agreement and the policy has been invalidated; (6) summary judgments should not have been rendered against it in favor of Bock and against it in its third party action against Bitkower for the reason that the evidence is conflicting with respect to the agreement between the assureds as to title to the diamonds lost and as to the risk in case of loss; and (7) the evidence raises an issue of fact as to the reasonable cash market value of the diamonds at the time and place of the loss.

The third alternative point has presented considerable difficulty to us. The memo-randums contain this recitation: "Such merchandise, until returned to them and actually received, are at your risk from all hazards." There is no pleading of ambiguity with reference to the above recitation. Nevertheless both Bock and Bitkower testified without objection that the memorandums were not intended to be contractual in nature, but were only intended for inventory and bookkeeping purposes. Their real contract, they say, was oral. The forms are standard printed forms used in the jewelry trade.

We find it difficult to reconcile the written memorandums and the oral agreements entered into between Bock and Bitkower. We think their contract was partly written and partly oral.

The rule is that ordinarily a bailee is not liable to the bailor for the loss or damage of the bailed property unless the loss was caused by the negligence or misconduct of the bailee. But the parties may by special contract between them make the bailee liable to the bailor as an insurer of the safety of the property. Was that intended in this case? Did Bock and Bitkower by the quoted recitation mean that the property was held at Bitkower's risk from all hazards as an insurer even if Bitkower was in no way at fault? Or did they mean that Bitkower held the diamonds at his risk from all hazards attributable to Bitkower's negligence or fault?

We have concluded that the quoted recitation is not to be construed as meaning that Bitkower is to be held liable to Bock as an insurer against the loss or damage of the bailed property. We have so concluded because the authorities seem to hold that before a contract will be held to bind a bailee as an insurer it must so state expressly and explicitly.

In Thornton v. Athens Nat. Bank, 252 S.W. 278 (Tex.Civ.App., Beaumont 1923,

writ dism'd), a memorandum as follows was signed by the Bank:

"Wiley Thornton has deposited in this bank $2,000 government bonds bearing interest at 4¼ per cent. The above bonds are left for safe-keeping and are the property of said Wiley Thornton, and are to be delivered to him or his assigns upon return of this receipt."

The bonds were stolen by robbers in a holdup. It was held that the bank was not liable as insurer. See also cases cited in the above opinion.

In Cleaver v. Drake-Brannum Construction Co., 195 S.W. 206, 207 (Tex.Civ.App., Galveston 1917, no writ), a lease contract contained this provision:

"The said mixer is to be delivered by party of the first part [plaintiff] to the party of the second part [defendant], at Houston, Tex. * * * Party of the second part agrees to return to the party of the first part the mixer in as good condition as when received, fair wear and tear excepted, at the location at which the party of the second part received the mixer from the party of the first part, or to deliver it to any other point at the option of the party of the first part."

A flood destroyed the machinery. On rehearing the bailee was not held liable to the bailor. The court said that a contract does not enlarge the common law liability of a bailee *unless the intention to so enlarge appears by specific language in the contract.* The bailee was not held liable.

In Sanchez v. Blumberg, 176 S.W. 904 (Tex.Civ.App., San Antonio 1915, no writ), a contract provided that a tenant would use good and reasonable care and caution in the care and maintenance of a mule and would return the mule in as good condition as when received. The court said that to vary common law liability the intention to do so must clearly appear, and held that the tenant was not liable as an insurer.

Other cases which give some support to our holding in this case are: Seward v. First Nat. Bank in Meridian, 193 Miss. 656, 8 So.2d 236 (1942) (To change the obligation of bailee to that of insurer, the contract must *expressly* so provide); Agricultural Ins. Co. v. Constantine, 144 Ohio St. 275, 58 N.E.2d 658 (1944) (Ticket for stored car said on its fact that cars were left after closing hours "at owner's risk." Held ticket was merely for identification and did not become a part of contract.); Loeb v. Ferber, 346 Pa. 348, 30 A.2d 126, 150 A.L.R. 266 (1943) (contract making a bailee an insurer must be in clear and explicit language); Edward Hines Lumber Co. v. Purvine Logging Co., 240 Or. 60, 399 P.2d 893 (1965) (Promise to return "in as good condition as of this date, reasonable wear and tear excepted" did not make bailee an insurer).

Hanover's third point is overruled.

■ As pointed out by Hanover the policy provides by its seventh amendatory endorsement that "This insurance shall in nowise inure * * * to the benefit of any carrier or other bailee." In our opinion the insurance does not inure to the benefit of Bitkower, hence the agreement between Bock and Bitkower does not violate the terms of the policy. Bitkower is not named as an insured. He receives no part of the insurance proceeds. Bock, owner of the diamonds, is named insured and, as we have held, is entitled to the insurance money. Bock alone, not Bitkower, is the beneficiary of the policy. Hanover's fourth and fifth points are overruled.

Hanover's sixth point asserts that there are fact questions with reference to title of the diamonds and as to risk in case of loss. We think our holdings in our consideration of Hanover's first, second and third points dispose of the contentions raised by this point. It is overruled.

In its seventh point Hanover asserts that the evidence raises an issue of fact as to the reasonable cash market value of the

diamonds at the time and place of the loss. We agree with Hanover.

 The policy provides, "The Company shall not be liable beyond the actual cash value of the property at the time of any loss or damage * * *." Our courts have held that "actual cash value" is the market value of the property insured. Manchester Fire Ins. Co. v. Simmons, 12 Tex.Civ.App. 607, 35 S.W. 722, 723 (Tex. Civ.App.1896, writ ref'd). We find no evidence of the market value of the diamonds at Lincoln, Nebraska on November 19, 1966. An adjuster undertook to show the cost of the diamonds to Bock and the minimum sale price at which Bitkower was permitted to sell. However his testimony as to the number of diamonds stolen and their value is uncertain and does not establish the value of the stolen property. Bock testified that the stolen diamonds had an actual cash value of $4,934.89. But he did not testify as to the actual cash value of the property at Lincoln, Nebraska on the date of the theft. At best the testimony, if it can be considered at all as evidence of market value, does no more than raise a fact issue. This summary judgment cannot be permitted to stand under the circumstances. Ara v. Rutland, 215 S.W. 445 (Tex.Comm'n App.1919, opinion adopted); Finger v. Home Ins. Co., 379 S.W.2d 950, 952 (Tex.Civ.App., Houston 1964, no writ). Appellant's seventh point is sustained.

 Under Rule 166–A, Sec. (d), Vernon's Texas Rules of Civil Procedure, pertaining to district and county courts, the trial court could have rendered a partial summary judgment as to liability and later tried the damage issue on its merits. City of Houston v. Socony Mobil Oil Co., 421 S.W.2d 427 (Tex.Civ.App., Houston 1967, writ ref'd n. r. e.); Coastal States Crude Gathering Co. v. Strauch, 410 S.W.2d 945 (Tex.Civ.App., Corpus Christi 1967, no writ). But the court did not do so.

 Rule 434, T.R.C.P., pertaining to Courts of Civil Appeals, provides that said courts upon reversal of a judgment may proceed to render such judgment as the trial court should have rendered *"except when * * * the damage to be assessed * * * is uncertain * * *."* (Emphasis ours.) It is well settled that Courts of Civil Appeals may not affirm a judgment as to liability, but reverse and remand a portion of it for trial of the damage issue. Waples-Platter Co. v. Commercial Standard Ins. Co., 156 Tex. 234, 294 S.W.2d 375 (1956).

Because of our having sustained appellant's seventh point, the judgment of the trial court will be reversed and remanded to the trial court for further proceedings.

Reversed and remanded.